AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

### Central District of California

|  |  |
|---|---|
| United States of America | |
| v. | |
| CHRISTOPHER MORALES,<br>aka, "M30Bluess" and "Chris Plug," | |
| Defendant | |

**LODGED**
CLERK, U.S. DISTRICT COURT

**SEP - 6 2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPTUY

Case No.  **2:24-mj-05432-DUTY**

**FILED**
CLERK, U.S. DISTRICT COURT

9/6/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ bm _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 8, 2024, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C) | Distribution of Fentanyl Resulting in Death |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Michael Sier, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:       9/6/2024
_____

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kelsey A. Stimson x8230

**AFFIDAVIT**

I, Michael Sier, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Christopher MORALES ("MORALES"), also known as "M30Bluess" and "Chris Plug," for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of Fentanyl Resulting in Death.

2.   This affidavit is also made in support of applications for warrants to search the person of MORALES, as described more fully in Attachment A-1; MORALES's residence in Palmdale, California (the "SUBJECT PREMISES"), as described more fully in Attachment A-2; and a two-door convertible white Mitsubishi Spyder believed to be used by MORALES (the "SUBJECT VEHICLE"), as described more fully in Attachment A-3.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. BACKGROUND OF AFFIANT

5.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since September 2012. I am assigned to the Los Angeles Field Division, Sensitive Investigations Unit. Starting in May 2012, I received training at the DEA Training Academy in Quantico, Virginia, in criminal law, criminal procedure, surveillance operations, search warrants, report writing, undercover operations, confidential source management, money laundering, asset forfeiture, violations of Title 21 of the United States Code, and criminal conspiracies involving the smuggling and distribution of drugs. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of monetary proceeds of narcotics trafficking. I am familiar with the unlawful importation, possession with the intent to distribute, and distribution of controlled substances, as well as the related monetary transactions involving the proceeds of specified unlawful

activities.  In conducting investigations, I have become aware of techniques utilized by narcotics traffickers and money launderers.  I have learned that these individuals utilize tactics to avoid detection and apprehension by law enforcement officials.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    On or about March 11, 2024, law enforcement responded to a 911 call that 24-year-old victim G.F. ("Victim G.F.") was unresponsive, not breathing, and had foam around his mouth and nose.  After life saving measures failed, Victim G.F. was pronounced dead that same day.  A toxicology report and expert opinion later indicated that he had died of a fentanyl overdose.

7.    Investigation into Victim G.F.'s cellphone communications showed that he had purchased narcotics from a dealer that used Telegram account M30Bluess and a specific cellphone number ending in -9015 (the "-9015 Number"), which was saved in Victim G.F.'s cellphone as "Chris Plug."  Further investigation revealed that the -9015 number was used by MORALES and linked to the M30Bluess Telegram account.  Messages from Victim G.F.'s phone indicated the drug transaction with the -9015 Number was coordinated for March 8, 2024 -- three days before Victim G.F. was found dead.  Historical cell site data for the -9015 Number placed the cellphone in the general area of Victim G.F.'s residence on March 8, 2024, at approximately the time of the drug transaction.  Additionally, surveillance footage showed a white Mitsubishi Spyder (the SUBJECT VEHICLE) driving to and parking near Victim G.F.'s house on March 8 at

approximately the time of the drug transaction.  Other communications recovered from Victim G.F.'s phone showed that the user of the M30Bluess Telegram account had provided Victim G.F. the SUBJECT PREMISES as the location for meeting for a prior drug transaction.

8.    A state search warrant was executed at MORALES's residence on or about April 3, 2024, and investigators recovered fentanyl and indicia of drug trafficking.  In a <u>Mirandized</u> interview, MORALES told law enforcement that he did not know Victim G.F.  On MORALES's phone, investigators later found the same Telegram messages and text messages setting up the March 8 drug transaction that were recovered from Victim G.F.'s phone.

9.    On August 27, 2024, a second victim, P.M., died and investigators believe that he died of an overdose from fentanyl distributed by MORALES based on text messages found on P.M.'s phone to a dealer named "Chris" at a telephone number connected to the M30Bluess Telegram account.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    March 11, 2024: Law Enforcement Learns of Victim G.F. Who Died of a Fentanyl Overdose.**

11.    On March 11, 2024, at approximately 9:00 a.m., Los Angeles Sheriff's Department ("LASD") deputies responded to a 911 call of an overdose victim, 24-year-old Victim G.F., at a residence in Palmdale, California.  On the recorded call, the

caller stated that Victim G.F. had been found on his bed, not breathing, and with foam around his mouth and nose. The Los Angeles County Fire Department also responded to Victim G.F.'s residence and administered C.P.R. and Narcan. At approximately 9:45 a.m., the Fire Department pronounced Victim G.F. deceased.

12. According to the law enforcement report, the deputies saw and recovered multiple items indicating drug use from on or around Victim G.F.'s bed: plastic straws, some with a white powdery residue; pieces of burnt foil, some with residue of suspected fentanyl; a gray Bic pen casing; and a black Samsung cell phone that was later determined to belong to Victim G.F. Based on my training and experience, I am aware that plastic straws and foil can be used for smoking fentanyl. Deputies also recovered five blue pills marked "M30".[1]

13. Detectives spoke with Victim G.F.'s family members who also lived in the residence; namely, Victim G.F.'s grandmother, A.F.; his grandfather, E.F.; and his sister, J.F.

    a. A.F. stated that she last saw Victim G.F. at 10 p.m. on March 10, 2024. At approximately 9:00 a.m. on March 11, she opened Victim G.F.'s bedroom door and discovered him unresponsive and not breathing. She immediately told J.F. to

---

[1] According to law enforcement reports, the deputies did not recover the five blue, M30 pills during their first search of Victim G.F.'s bedroom. About 30 minutes after the deputies left, Victim G.F.'s sister called Detective Tim Rivera and said she had been cleaning Victim G.F.'s room and found the pills in a marijuana package on the bed. Detective Rivera returned and seized the pills. The marijuana bag is visible in photos taken of Victim G.F.'s bedroom before deputies searched it.

call 911. A.F. stated she did not have any knowledge of Victim
G.F. using drugs other than marijuana.

   b.  E.F. told the detectives that the last time he
saw Victim G.F. alive was around 10:00 p.m. on March 10. He
said he did not have any knowledge of Victim G.F. using drugs
other than marijuana. He said that an outdoor surveillance
camera was affixed to the residence but that he had previously
deleted the recorded footage after watching it in order to free
up storage space. He said that he did not see any activity in
the camera on the morning of March 11. He also said that he was
aware Victim G.F. had two cellphones, a red one and a black one,
and provided detectives with two phone numbers.

   c.  J.F. told the detectives that she lives in the
residence and last saw Victim G.F. alive at about 10:00 p.m. on
March 10. She said that she believed Victim G.F. used to have
two cellphones but that one was broken. She provided the same
phone number that E.F. had provided for one of Victim G.F.'s
cellphones.

  14.  Laboratory testing of one of the five blue M30 pills
recovered from Victim G.F.'s bedroom determined that the pill
contained fentanyl.

  15.  A toxicology report dated April 15, 2024, indicated
that Victim G.F. had only fentanyl and norfentanyl in his system
at the time of his death. On or about June 12, 2024, Dr.
Rakhshanda Ruby Javed, Chief of the Forensic Science
Laboratories Division at the Los Angeles County Department of
the Medical Examiner, provided an expert opinion, "that but for

the fentanyl in the decedent's system, this decedent would not have died."

**B.    Victim G.F.'s Phone Shows He Purchased Narcotics on March 8, 2024, from Chris Plug / M30Bluess.**

16.    On March 12, 2024, the Honorable Holly L. Hancock of the Los Angeles County Superior Court authorized a search warrant for the black Samsung phone recovered from Victim G.F.'s bedroom.  Based on talking with Detective Rivera and review of his law enforcement reports, I learned the following:

a.    During a search of Victim G.F.'s cellphone, investigators discovered a Telegram conversation and text message conversation referring to a drug transaction on March 8, 2024 -- three days before Victim G.F. was pronounced deceased -- which is believed to be the source of the fentanyl that caused his overdose, as explained below.

b.    The Telegram messages were between Victim G.F. and a user with the username "M30Bluess" and the profile name "M30Bluesss🔵✈️".  Based on my training and experience, I am aware that the 🔵 emoji represents M30 pills, and the ✈️ emoji indicates that narcotics can be shipped to the buyer's location. The Telegram account had a profile photo of what appears to be blue, M30 pills and the following information listed on the profile page: "https://t.me/palmdaleblues Best Prices Shipping World Wide ✈️🔵🔑🍬🌲🧱". Based on my training and experience, I am aware the 🔑 is an emoji of a plug which is a slang term for a source of supply; the 🍬 emoji refers to edibles; the 🌲 emoji refers to marijuana; and the 🧱 emoji means that the drugs are

powerful.  Based on the above and my training and experience, I understand "Best Prices Shipping World Wide" to mean that the account user is advertising the international sale of drugs.

      c.   The messages between Victim G.F. and M30Bluess dated back to December 12, 2023.  Victim G.F. addressed the Telegram user as "Chris" and, on multiple occasions between December 12, 2023, and March 8, 2024, asked to purchase "blues" and "percs" from M30Bluess.  Based on my training and experience, I believe that when Victim G.F. used the word "blues," he was referring to fentanyl pills or to M30 pills, and when Victim G.F. used the word "percs," he was referring to Percocet which is a drug which consists of a combination of Acetaminophen and Oxycodone.  Fentanyl pills are referred to as "blues" due to their resemblance to Oxycodone pills and their coloring being blue.  Prescription and counterfeit Oxycodone pills often have "M30" pressed into the pill.  I am also aware that persons involved in the trafficking of drugs commonly talk in vague and/or coded language to thwart law enforcement's efforts and code to avoid detection by anyone who overhears the conversation or in case the phone is being electronically intercepted.

      d.   During another Telegram conversation referring to a drug transaction, M30Bluess messaged Victim G.F., "These are fire, bro," and indicated he would give Victim G.F. foil.  Based on my training and experience, I am aware that foil is used as part of the ingestion process for smoking pills.  In other Telegram conversations referring to drug transactions, M30Bluess

provided the -9015 Number and told Victim G.F. to meet him near to the SUBJECT PREMISES in the "grass spot."

e.   Investigators also recovered from Victim G.F.'s phone a text message conversation that appeared to relate to the M30Bluess Telegram conversation.  The text message conversation was between Victim G.F. and the -9015 Number, which was saved in Victim G.F.'s phone as "Chris Plug."  Based on my training and experience and conversations with other members of law enforcement, I am aware that "Plug" is street terminology for a drug dealer.

f.   I believe that Chris Plug and M30Bluess are the same person based, in part, on the following: the -9015 Number was provided to Victim G.F. by M30Bluess; Victim G.F. referred to both Chris Plug and M30Bluess as "Chris"; the -9015 Number was later determined to be logged into the M30Bluess Telegram account (as discussed herein); and the text message conversation with Chris Plug appears to pick up where the Telegram conversation with M30Bluess left off on March 8, 2024, as shown below:

| Sender | Platform | Time Sent | Message |
|---|---|---|---|
| Victim G.F. | Telegram | 11:33 a.m. | (Canceled outgoing voice call) |
| Victim G.F. | Telegram | 2:11 p.m. | Lmk idk if ill have the car later |
| Victim G.F. | Telegram | 2:18 p.m. | And I actually just got some bud from my sis Can I get the 50 of blues |
| Victim G.F. | Telegram | 4:56 p.m. | Wassup with it chief I'm still down if you're on |
| Victim G.F. | Telegram | 8:05 p.m. | (Canceled outgoing voice call) |

| Victim G.F. | Telegram | 8:11 p.m. | Bro? |
|---|---|---|---|
| Victim G.F. | SMS | 11:35 a.m. | Wassup with it playa playa it's *[shortened form of Victim G.F.'s name]* can I pick up? Lmk I go to work at 1 |
| Chris Plug | SMS | 8:45 p.m. | Yo<br>Barely got in town pops Lmk |
| Victim G.F. | SMS | 8:46 p.m. | My boi I almost lost hope!!<br>I spent some dough in some food g can I get 50 |
| Chris Plug | SMS | 8:47 p.m. | No worries bro you need me to deliver<br>You want a $50 of what my boy |
| Victim G.F. | SMS | 8:45 p.m. | Of some blues?<br>I can shoot you a 60 instead for gas |
| Chris Plug | SMS | 8:49 p.m. | Bet bro bro just blues right bro<br>appreciate you fr bro<br>Send me addy I'll go rn if your ready |
| Victim G.F. | SMS | 8:49 p.m. | Yea I just go some buds from my sis and here's the addy *[Victim G.F's address]* |
| Chris Plug | SMS | 8:49 p.m. | Bet bro bro<br>On my way |
| Victim G.F. | SMS | 8:50 p.m. | Handles lmk |
| Chris Plug | SMS | 8:51 p.m. | And if you ever wanna get a big amount I do $100 for 25 |
| Victim G.F. | SMS | 8:51 p.m. | Sheeshe I start working Monday so I'll let you know big pimpin |
| Chris Plug | SMS | 8:52 p.m. | Ya bro just lyk just incase<br>On my way! Gimme 10-15 min<br>I'll lyk when I'm close pops |
| Victim G.F. | SMS | 8:52 p.m. | Alright and appreciate you fam |
| Chris Plug | SMS | 9:12 p.m. | Yo bro 1 min |
| Victim G.F. | SMS | 9:13 p.m. | Alright |
| Chris Plug | SMS | 9:13 p.m. | Here bro |

g.    Based on my training and experience, I believe that when Victim G.F. referenced the number "50," he was referring to the cost to purchase narcotics. When Chris Plug replied, "I do $100 for 25," I understood him to be saying that he sells 25 blue pills for $100.

h.    Investigators also recovered from Victim G.F.'s phone a March 8, 2024, Instagram conversation between Victim G.F. and an Instagram account bearing the profile name, "RN4L 🏆" and the username, "tgsabkk". In the conversation, Victim G.F. attempted to set up a drug transaction that did not appear to be completed, as shown below:

| Sender | Platform | Time Sent | Message |
|--------|----------|-----------|---------|
| tgsabkk | Instagram | 8:08 p.m. | Forty<br>I got you<br>Lmk papa |
| Victim G.F. | Instagram | 8:28 p.m. | I'm down sorry eas putting baby to sleep<br>Was |
| tgsabkk | Instagram | 8:30 p.m. | okay<br>you want me to pull up? |
| Victim G.F. | Instagram | 8:31 p.m. | if you can bro I cant really see at night when it comes to driving |
| tgsabkk | Instagram | 8:32 p.m. | I got you<br>want me to pull up now |
| Victim G.F. | Instagram | 8:32 p.m. | Ya bro whenever you're free no rush |
| tgsabkk | Instagram | 8:33 p.m. | Okay I'll lyk when I'm coming ?<br>On 47th bro |
| Victim G.F. | Instagram | 9:12 p.m. | In with my sis rn let me ask if she's down still |
| tgsabkk | Instagram | 9:13 p.m. | Lmk asap<br>I'm around rn |
| tgsabkk | Instagram | 9:19 p.m. | lmk |
| Victim G.F. | Instagram | 9:20 p.m. | I'm being ignored rn big pimpin |
| tgsabkk | Instagram | 9:21 p.m. | Ok |

| | | | Ima b around for like ten mins lmk |
|---|---|---|---|

      i.   Based on the Instagram messages between Victim G.F. and tgsabkk, neither Victim G.F. nor tgsabkk ever confirmed the deal, and in light of the surrounding context of the drug transaction Victim G.F. arranged for the same night with Chris Plug/M30Bluess, Victim G.F. does not appear to have gone through with a drug deal with tgsabkk.

    **C.**    **Historical Cell Site Data Shows that the -9015 Number (Chris Plug) Was in the Area of Victim G.F.'s Residence During the March 8, 2024, Drug Transaction.**

   17.  On March 15, 2024, Judge Hancock authorized a search warrant for historical cell site data and tolls for Victim G.F.'s cellphone number and for the -9015 Number, as well as for prospective location data information for the -9015 Number. The returns indicated that no subscriber information was available for either phone number. According to Detective Rivera, the returns also showed that the -9015 Number had been pinging in the area of Victim G.F.'s residence on March 8, 2024, around 9:13 p.m., which was the approximate date, time, and place that the messages between Victim G.F. and Chris Plug indicate the drug sale occurred.

   18.  Based on the historical cell site data and the text messages and Telegram messages recovered from Victim G.F.'s phone, I believe that the user of -9015 Number and of the M30Bluess Telegram account went to Victim G.F.'s house around 9:13 p.m. on March 8, 2024, and sold Victim G.F. fentanyl.

**D.   Surveillance Footage Places the SUBJECT VEHICLE Near Victim G.F.'s Residence around the Time of the Drug Transaction on March 8, 2024.**

19.   On or about March 13, 2024, Detective Tim Rivera viewed surveillance footage from a residence down the street from Victim G.F.'s home. According to Detective Rivera, the footage showed that, on March 8, 2024, at the time of the drug transaction with Victim G.F. at approximately 9:14 p.m., a white, older model Mitsubishi Spyder convertible (the SUBJECT VEHICLE) drove west on East Avenue R12. The vehicle turned north onto 29th Street East and parked just west of Victim G.F.'s residence.[2]   No other cars passed during the same time period.

20.   According to Detective Rivera, Google Maps Street View also captured in April of 2022 that a similar appearing two-door convertible white Mitsubishi Spyder (the SUBJECT VEHICLE) was parked in the driveway of the SUBJECT PREMISES.

21.   Based on the above, investigators concluded that the drug dealer using the -9015 Number and the M30Bluess Telegram account drove the SUBJECT VEHICLE to Victim G.F.'s residence to conduct the drug transaction on March 8, 2024.

**E.   Investigators Identify MORALES as the User of the M30Bluess Telegram Account and of the -9015 Number (i.e., Chris Plug), as a Driver of the SUBJECT VEHICLE, and as Residing at the SUBJECT PREMISES.**

22.   As discussed above, the M30Bluess Telegram Account had the following link in its profile bio information: https://t.me/palmdaleblues.  Investigators followed the link and

---

[2] Detective Rivera also viewed surveillance footage from a residence located south of Victim G.F.'s residence.  The footage did not capture any activity between 9:00 p.m. and 9:30 p.m. on March 8, 2024.

found that it led to another Telegram profile named "Av Plug🔪🛒🌲🧃" with the following page description: "Shipping & In Town Plug Services🔪Antelope Valley 📍".  Based on my training and experience, I understand the 🛒 to mean for sale.  I also understand the page description to mean that the user of the account is advertising the sale and shipping of drugs and is based in the Antelope Valley.  The Telegram account had videos advertising blue fentanyl pills, fentanyl, firearms, and cannabis products for sale.

23.  One video posted on the Av Plug🔪🛒🌲🧃 Telegram account that was saved to the user's reel and not dated showed a male Hispanic between the ages of nineteen and twenty-five with dark hair that resembled a law enforcement booking photo of MORALES.  (On the left below is a screenshot from the video on the Av Plug🔪🛒🌲🧃 Telegram account; on the right below is a booking photo of MORALES taken April 3, 2024.)

 

24.  In October 2022, the Av Plug 🔪🛒🌲🗑 Telegram account posted another video of a male Hispanic that resembled MORALES holding a large sum of US currency and the video referenced the TikTok username "@backwoodchriss". Investigators searched the TikTok account "@backwoodchriss" and found references to another TikTok account, "@bluestripchrisss". Both TikTok accounts (@backwoodchriss and @bluestripchrisss) had photos of a Hispanic male that resembled MORALES.  (In the images below, on the top left is a screenshot from the @bluestripchrisss account; and on the top right is an April 3, 2024 booking photo of MORALES.)



25.    The @bluestripchrisss account also posted a video
dated February 8, 2023, that appeared to be Ring doorbell
footage featuring different clips of what appeared to be the end
of a pursuit.  Captions accompanying the video read: "They were
in a pursuit here in Palmdale CA," and "That's Me Chasing Her
Thru My House".  The video also showed multiple LASD deputies in
front of the residence.  Investigators learned from the Palmdale
Sheriff's Department that a vehicle pursuit occurred on February
8, 2023, in Palmdale and that the suspects in the pursuit ran
from deputies through the SUBJECT PREMISES.

26.    Using department resources, investigators also learned
that MORALES listed the SUBJECT PREMISES on his California DMV
records as his residence.[3]

[3] Based on MORALES'S California DMV records, I am aware that the
identifiers (height, weight, birth date, driver's license
number, etc.) that are listed in Attachment A-1 are accurate.

16

27.  In addition, on March 26, 2024, investigators used ping data for the -9015 Number and learned that the -9015 Number was pinging in the general area of the SUBJECT PREMISES.  On the same day, investigators conducted surveillance at the SUBJECT PREMISES and saw MORALES exit the front door of the SUBJECT PREMISES, enter the driver's seat of the SUBJECT VEHICLE, which was parked directly in front of the SUBJECT PREMISES, and drive to Vallarta Supermarkets at 1803 East Palmdale Boulevard, Palmdale.[3]  As MORALES drove and then entered the Vallarta Supermarkets, GPS precision location data changed with him, indicating the -9015 Number was in his possession.

**F.    April 3, 2024: Investigators Recover Fentanyl and Indicia of Drug Trafficking from the SUBJECT PREMISES.**

28.  On April 3, 2024, detectives from the LASD Narcotics Bureau executed a state search warrant for MORALES, the SUBJECT VEHICLE, and the SUBJECT PREMISES.  According to the law enforcement report and the investigators present, including Detective Rivera, I know the following:

a.    From a bedroom that MORALES's grandparents, M.S. and A.S., identified as belonging to MORALES, investigators recovered fentanyl and indicia of drug-trafficking, namely: a plastic bag containing fentanyl; a plastic straw containing suspected narcotic residue; pieces of burnt foil; unused foil; digital scales; an unlocked, black Apple iPhone; and mail

---

[3] Investigators ran the license plate and learned that the car is registered to A.S. and R.V.S. at the SUBJECT PREMISES. As established above, A.S. is MORALES's grandparent and R.V.S. is MORALES's mother.

addressed to MORALES at the SUBJECT PREMISES.  Investigators
also recovered approximately $442 from MORALES's person.

b.    A.S. told investigators that he lived at the
premises with MORALES.  A.S. also told investigators that he was
aware of MORALES's use of narcotics and that he would bring
overdose incidents to MORALES's attention to convince him to
stop using narcotics.  He said that he was not aware that
MORALES was selling narcotics but that he was aware MORALES
would meet individuals near the SUBJECT PREMISES and believed
that the meetings were drug transactions.

c.    MORALES was arrested for the sale of narcotics in
violation of California Health and Safety Code Section 11351.
He was read his Miranda rights on scene and interviewed later at
the Sheriff's Station.

d.    Based on my review of the recorded interview, I
know the following: MORALES denied that he was selling
narcotics.  He told the investigators that he was aware of the
risks of overdose from fentanyl.  When shown a picture of Victim
G.F.'s residence, he admitted that he knew the house and that a
guy named "Angel" lived there who would tell MORALES where to
buy narcotics.  He said that Angel was not Victim G.F. and he
denied knowing Victim G.F. or contacting Victim G.F.

29.    Later, the investigators obtained a state search
warrant for MORALES's cellphone and discovered the same text
messages and Telegram messages with Victim G.F. that were
recovered from Victim G.F.'s phone regarding the March 8, 2024,

drug transaction.  It was also discovered that MORALES's cellphone was connected to the Telegram account M30Bluess.

30.  Investigators recovered other messages on MORALES's phone that showed he was arranging narcotics transactions with other users.  For example, in a text conversation dated on or about February 19, 2024, MORALES messaged in coded language with a buyer identified as "parrino05@icloud.com" to coordinate a drug sale for $40 worth of fentanyl.  Later in the conversation, the buyer asked MORALES to confirm the fentanyl was in pill form and MORALES responded, "Ya the blue m30".  MORALES also provided Cash App username "$Rosaparks13" for payment, which is an account associated with MORALES's mother.

**V.   Law Enforcement Links a Second Overdose Death to MORALES's Fentanyl Distributions.**

    **A.   Cellphone Communications Indicate that Victim P.M. Purchased Fentanyl from a Dealer Named "Chris" that Used a Phone Number Linked to M30Bluess.**

31.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

    a.   On or about August 27, 2024, P.M. was found unresponsive in the garage of his mother's house.  He was found by his mother. The Los Angeles County Fire Department responded and pronounced P.M. dead.  While the investigation is ongoing, investigators believe that P.M.'s death is an overdose resulting from fentanyl distributed by MORALES.  Specifically, a text message from P.M.'s phone indicated a $20 transaction on August 26, 2024, with a dealer referred to as "Chris."  P.M. texted the

dealer on August 26 at a telephone number ending in -5193 (the "-5193 Number"). Based on a review of Victim P.M.'s contacts on Telegram through the Telegram app on his cellphone, the -5193 Number is listed for MORALES's M30Bluess Telegram account.

b. In addition, during the text message conversation between P.M. and the dealer at the -5193 Number setting up a drug transaction, P.M. texted: "I'm here". The -5193 Number responded: "Coming 1 min, Meet at the wall, At the grass area". Based on speaking with Detective Rivera, I am aware that next to MORALES's residence (the SUBJECT PREMISES) there is a wall which separates his property from an area of grass which I believe the user of the -5193 Number is referencing. In addition, MORALES used similar language and directions when he instructed Victim G.F. from the Telegram account M30Bluess to meet at the "grass spot" for one of their earlier drug transactions.

**B.    Surveillance Shows that MORALES Continues to Reside at the SUBJECT PREMISES and to Drive the SUBJECT VEHICLE.**

32. On September 4, 2024, LASD narcotics detectives conducted surveillance at the SUBJECT PREMISES and saw the SUBJECT VEHICLE parked across the street from the residence. Detectives obtained a state search warrant for the GPS location data of the -5193 Number. The pings showed the user was in the general area (300 meters) of the SUBJECT PREMISES on September 4, 2024.

33. On the same day, at approximately 8:40 p.m., Detective Rivera saw an individual wearing a light-colored gray hooded sweater exit the front gate of the location. Detective Rivera

later identified the individual as MORALES based on having seen
him during the April 3, 2024 arrest.  MORALES walked across the
street, entered the SUBJECT VEHICLE, and drove to PetSmart at
38147 47th Street East in Palmdale.  As MORALES was driving, GPS
precision location data changed with him, indicating that the
cellphone with the -5193 Number was in his possession.
Detective Matt Doud called the -5193 Number and heard someone
answer the phone and say, "What up?"  At the same time that
Detective Doud heard the answer, Detective Aaron Rivera saw
MORALES take his phone out of his pocket and manipulate it,
appearing to answer.  MORALES then entered Target at 38019 47th
St E in Palmdale, returned to the SUBJECT PREMISES in the
SUBJECT VEHICLE, and entered the SUBJECT PREMISES.  During this
surveillance, the GPS precision location data showed the mobile
device in the general area of MORALES's movements with no other
individuals accompanying him.

### VI.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

34.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]</u>

35. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

    c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

    d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    36.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

37.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MORALES's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MORALES's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

2.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    <u>CONCLUSION</u>

38.  For all the reasons described above, there is probable cause to believe that MORALES violated 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Distribution of Fentanyl Resulting in Death) on or about March 8, 2024.  There is also probable cause that the items to be seized described in Attachment B will be found in a

search of the person, SUBJECT PREMISES, and SUBJECT VEHICLE

described in Attachments A-1, A-2, and A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 6th day of
September, 2024.

_____
HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

PERSON TO BE SEARCHED

The person of Christopher MORALES is a male Hispanic adult who was born May 10, 2002, is 5'08" tall, weighs 130 pounds, and has a California Driver's License number Y6120946. The California Department of Motor Vehicles lists his residential address for Christopher Morales as 2511 East Avenue Q-14, Palmdale, California 93550.

The search of MORALES shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within MORALES's immediate vicinity and control.  A photograph of MORALES is below.



## ATTACHMENT A-2

PREMISES TO BE SEARCHED

The premises to be searched is located at 2511 East Avenue Q-14, Palmdale, California 93550. The location is a two-story residence on the northeast corner of East Avenue Q-14 and 25th Street East. The location has a beige stucco exterior, green trim, and a red tile roof. Multiple solar panels are on the roof on the south side of the residence facing toward East Avenue Q-14. The brown front door faces south and has numerous glass windows. A white concrete pillar fence and green concrete walls surround the location. The location has a white wrought iron gate in front of the driveway, and another just east of the driveway affixed to green concrete pillars. The number 2511 is affixed to the front yard's concrete wall and painted on the curb in front of the residence.  A photograph is below:



Search of the residence shall include all rooms, attics, basements, garages (either attached or detached) and other parts therein; surrounding grounds, storage rooms, trash containers and any outbuildings of any kind located thereon; any combination safes and locked boxes therein; any and all computer data bases and software, to include cellular telephone devices.

**ATTACHMENT A-3**

VEHICLE TO BE SEARCHED

A two-door convertible white Mitsubishi Spyder with California license plate DP893MY. A photograph of the vehicle is below, an additional photograph of the vehicle in the driveway of MORALES's residence is located in the photograph in Attachment A-2:



**ATTACHMENT B**

<u>ITEMS TO BE SEIZED</u>

    1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

        a.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances ~~or firearms~~, or drug ~~or firearms~~ customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs~~, guns, or ammunition,~~ were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

        b.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

i

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

d.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

e.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs~~, firearms, or ammunition~~;

*JPR*
*MS*

f.    Contents of any calendar or date book;

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

ii

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser

history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

<u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated techniques.

      c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

      f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

        h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

        a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

        b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

        c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

        d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

        e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

        f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress MORALES's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MORALES's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.